## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 28 2020, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Timothy P. Broden
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin J. Shoptaw
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Devin Lamont Sanders, *Appellant-Defendant,* | April 28, 2020 |
| v. | Court of Appeals Case No. 19A-CR-1940 |
| | Appeal from the Tippecanoe Superior Court |
| State of Indiana, *Appellee-Plaintiff* | The Honorable Kristen E. McVey, Judge |
| | Trial Court Cause No. 79D05-1808-F6-1181 |

**Kirsch, Judge.**

[1] Devin Lamont Sanders ("Sanders") was convicted after a jury trial of two counts of intimidation[1] as Level 6 felonies, one count of resisting law enforcement[2] as a Class A misdemeanor, and one count of criminal trespass[3] as a Class A misdemeanor. Sanders raises the following two issues for our review:

> I. Whether the trial court abused its discretion by not appointing him standby counsel.

> II. Whether the state presented sufficient evidence to support his conviction for intimidation as a Level 6 felony.

[2] We affirm.

## Facts and Procedural History

[3] On August 10, 2018, Denise Rhymer ("Rhymer"), the general manager of the JCPenney store in the Tippecanoe Mall in Lafayette, Indiana, received a phone call from a supervisor in the men's department that Sanders was not wearing a shirt, would not put his shirt back on, and requested to speak with the manager. *Tr. Vol. 2* at 41. Rhymer and one of the store's loss prevention officers went to the men's department to ask Sanders if he needed help. *Id.* Sanders said nothing, put on his headphones, started singing "really loudly[,]" and eventually called Rhymer a "bitch". *Id.* at 42. Rhymer asked Sanders, who continued to be "really loud and obnoxious", to leave the store. *Id.* Rhymer

---

[1] *See* Ind. Code § 35-45-2-1.

[2] *See* Ind. Code § 35-44.1-3-1.

[3] *See* Ind. Code § 35-43-2-2.

asked her loss prevention officer to call the police, and she and the loss prevention officer followed Sanders to the entrance of the mall. *Id.* At that point, Sanders was "up in [Rhymer's] face . . . [s]winging his arms", tried "chest bumping [Rhymer]" and continued to scream despite the presence of mall security officers. *Id.* at 43. Lafayette Police Department Officer James Jarrett ("Office Jarrett"), Officer Andrew McCormick ("Officer McCormick"), along with a recruit officer, arrived at the Tippecanoe Mall in response to the call from mall security. *Id.* at 59, 78.

[4]     Sanders continued his behavior until police arrived when he became "very lucid . . . very rational." *Id.* at 44. Officer Jarrett spoke with both Rhymer, who was "pretty frantic[,]" and Sanders about the events, which Sanders characterized as "a misunderstanding of some sort." *Id.* At the request of mall security, Officer Jarrett gave Sanders a trespass warning to leave the property, and Sanders began to leave the mall. *Id.* at 60-61. While he was leaving, Sanders came back towards Rhymer and told her that he was going "to come back and shoot [her]." *Id.* at 44, 61, 78. Officer McCormick confirmed with Rhymer that Sanders threatened her, and he followed Sanders out of the mall. *Id.* at 61, 78-79. Officer McCormick told Sanders he needed to leave the mall's property or he would be arrested for trespass. *Id.* at 79. Sanders went around the outside of the mall toward the north side of JCPenney. *Id.* The officers drove around to the north side of the mall to be sure that Sanders was leaving the mall's property and not attempting to reenter JCPenney through the north entrance. *Id.* at 80.

[5] Officer McCormick saw Sanders in a center island of the mall's parking lot attempting to remove a bicycle that was padlocked to a pole. *Id.* Sanders abandoned his attempt to remove the bicycle and went back toward JCPenney. *Id.* at 81. Officer McCormick approached Sanders, who was hiding behind a pole near the entrance to the store, told Sanders that he had been warned for trespass and needed to leave the mall's property. *Id.* Officer McCormick again told Sanders that he "had a couple of seconds to make it off the property or he was going to jail." *Id.* Sanders backed away from Officer McCormick, started "flashing fingers" which Officer McCormick interpreted as "gang signs, nonverbal communication[,]" and Sanders told Officer McCormick, "on my soul vice lord I got you." *Id.* at 81, 84, 120. Officer McCormick told Sanders he was under arrest, and Sanders "actively flexed and pulled forward to pull his hands" in a manner that prevented the officers from securing him in handcuffs. *Id.* at 82. Sanders continued to "fight and argue" and with Officer Jarrett's assistance the officers were eventually able to handcuff Sanders. *Id.* at 83.

[6] On August 27, 2018, the State filed an information charging Sanders as follows: (1) Count I, intimidation as a Level 6 felony.[4] (2) Count II, resisting law enforcement as a Class A misdemeanor. (3) Count III, criminal trespass as a Class A misdemeanor. *Appellant's App. Vol. 2* at 85-87. On January 22, 2019, the State moved to amend the charging information to add another count of

---

[4] Count I charges Sanders with intimidation of Officer McCormick.

intimidation, Count IV, as a Level 6 felony, which the trial court granted.[5] *Id.* at 77-79.

[7] On February 14, 2019, the trial court issued an order that, in part, appointed counsel for Sanders. *Id.* at 11, 67. On March 22, 2019, the trial court held a hearing at which Sanders, who was present with his court-appointed counsel, stated "it was already understood in this courtroom that I'm representing myself most of the times[,]" and the trial court showed Sanders' court-appointed counsel as withdrawn *Tr. Vol. 2* at 2-3.

[8] On May 30, 2019, the trial court commenced a jury trial. *Appellant's App. Vol. 2* at 13. At the outset of the trial and before seating the jury, the following exchange occurred between the trial court and Sanders, who was representing himself:

> THE COURT: [Y]ou have on many occasions told me that you do not want an attorney.
>
> BY MR. SANDERS: Correct.
>
> THE COURT: And that you do not - you understand your right to . . . have an attorney appointed to you if you cannot afford one. In fact, you have told me repeatedly that it is your wish to represent yourself, you do not want an appointed attorney, and you do not want to hire an attorney.
>
> BY MR. SANDERS: Yes, I said that.

---

[5] Count IV charges Sanders with intimidation of Rhymer.

THE COURT: And that's accurate right?

BY MR. SANDERS: Yes, on this case.

THE COURT: Alright, so we're proceeding to trial today. It is expected that you follow the rules of the court. Even though you are not [an] attorney you will be expected to follow the rules of the court and the rules of evidence in this case. So, even though you're not [an] attorney the court['] s expectation[] is that you follow those.

[9] *Tr. Vol. 2* at 5. The trial court again asked Sanders if he wished to represent himself and Sanders affirmed that he wanted to proceed without counsel. *Id.* at 14-15. Sanders then changed his mind and told the trial court that he wished for a specific attorney, Jon Phillips, from the Tippecanoe County Public Defender's Office to be appointed to represent him. *Id.* at 21. The following discussion between Sanders and the trial court then ensued:

BY THE COURT: Alright, I do find that the defendant is indigent and I'll appoint the services of the public defender and give this case new dates. You may go to the public defender's office on your date and request Jon Phillips or you can take them a letter to request him. They may or may not agree with you, I do not know.

BY MR. SANDERS: What about one you can appoint me now?

(Inaudible).

BY THE COURT: I'm going to appoint you — I'm going to appoint the public defender's office they decide in the office who you get.

BY MR. SANDERS: So, I can't get one this instant you're saying. So we just got to (indiscernible).

BY THE COURT: No, there would be no attorney that's standing by to wait for you.

BY MR. SANDERS: Okay, but we still pick the jury — jurors?

BY THE COURT: No, we don't go to trial today with — if you want an attorney. I don't have any way for an attorney to walk in the door right now and be ready for you. But, I strongly encourage you to have an attorney. These are trained lawyers that know the rules. And I'm going to hold you to the same standards I would for them. So...

BY MR. SANDERS: No, it's cool then.

BY THE COURT: You telling me you want an attorney, we're going to do that.

BY MR. SANDERS: We can go ahead and go through with right now since we ain't — since that's going to hold up something. We can go ahead and get this started as fast as possible.

BY THE COURT: So, you are telling me you do not want an attorney.

BY MR. SANDERS: Do not want an attorney, let's proceed.

BY THE COURT: Even though I will appoint you one right now and give you new dates.

BY MR. SANDERS: They can come and sit here at nine o-six.

BY THE COURT: I do not have the ability to appoint an attorney right now on the spot.

BY MR. SANDERS: Then no, then no. I thought you were saying on the spot.

BY THE COURT: I really encourage you.

BY MR. SANDERS: Excuse me for the misunderstanding.

BY THE COURT: I encourage you, Mr. Sanders.

BY MR. SANDERS: No, I'm going ahead, judge. I'm good, let's go ahead and proceed and pick the jury.

BY THE COURT: Alright.

*Id.* at 22-23. The trial court also stated to Sanders that a risk in self representation is the "emotional state of being involved in your own circumstances makes it harder to be objective" and "the ability to have a counsel that is not emotionally involved in the situation and can give you good legal advice is critical." *Id.* at 25. The trial court again asked Sanders if he was absolutely certain he wished to proceed without an attorney, and Sanders stated "[y]es, let's leave it to the jury." *Id.*

Following the trial, the jury found Sanders guilty as charged. *Id.* at 147. The trial court held a sentencing hearing on July 31, 2019, and sentenced Sanders to 180 days on each count to be served concurrently with ninety days executed in the Tippecanoe County jail and the balance served in Tippecanoe County community corrections. *Id.* at 160. Sanders now appeals.

## Discussion and Decision

## I. Appointment of Standby Counsel

Sanders argues that the trial court abused its discretion by not informing him of the possibility of appointing standby counsel. Sanders points out that: (1) this was his first jury trial; (2) he had limited criminal history; and (3) he was unfamiliar with legal terminology and trial procedure. The State counters that Sanders does not have the right to standby counsel and that his dissatisfaction with his own representation is not an abuse of discretion on the part of the trial court.

The right of self-representation is implicit in the Sixth Amendment to the United States Constitution, and Article 1, section 13 of the Indiana Constitution also guarantees this right. *Stroud v. State,* 809 N.E.2d 274, 279 (Ind. 2004). Appointment of standby counsel is an appropriate prophylactic device when a defendant assumes the burden of conducting his own defense. *Wilson v. State*, 94 N.E.3d 312, 324 (Ind. Ct. App. 2018) (citing *Jackson v. State*, 441 N.E.2d 29, 33 (Ind. Ct. App. 1982)). However, a defendant who proceeds pro se has no right to demand the appointment of standby counsel for

assistance. *Kindred v. State*, 521 N.E.2d 320, 323 (Ind. 1988). Rather, the decision of whether to appoint standby counsel is a discretionary one made by the trial court. *Id.*

[13] We note at the outset that Sanders's claim is not one that involves his failure to knowingly or intentionally waive his right to counsel; rather, Sanders claims that even though he waived his right to counsel, the trial court should have informed him of the possibility of standby counsel. Here, at Sanders's September 10, 2018 initial hearing, he signed an advisement of rights form, which, with respect to self-representation, included the following:

> You also have the right to represent yourself. If you represent yourself, you must follow all of the laws, rules of evidence, and proper legal procedures. The Judge and court staff are not allowed to give you advice or to tell you what you should do or how you should do it. Before deciding to represent yourself, you should understand that an attorney has skills and experience in preparing for trial and presenting a proper and persuasive defense. These skills include: investigating and interrogating witnesses; gathering appropriate documentary evidence; obtaining favorable defense witnesses; preparing and filing pretrial motions; preparing and filing appropriate written jury instructions; presenting effective opening statements and closing arguments; examining and cross-examining witnesses at trial; as well as recognizing, making, and responding to objections to potentially prejudicial evidence, questions, and testimony. An attorney could explain the charges and any lesser included offense. An attorney could explain and properly raise any defenses, legal or practical, that might benefit you. An attorney could explain and raise any mitigating circumstances surrounding the charge. An attorney is usually more experienced in plea negotiations and better able to identify and evaluate any

potential defenses and evidentiary or procedural problems in the prosecution's case.

*Appellant's App. Vol. 2* at 82-83. The trial court's initial hearing order, issued that same day, contained check marks indicating that Sanders had read and signed the advice of rights form, which included the provision regarding the risks of self-representation, and that he was orally advised of his rights by the judge. *Id.* at 84. Later, on February 14, 2019, the trial court appointed counsel for Sanders, which he rejected at a March 22, 2019 hearing, stating "it was already understood in this courtroom that I'm representing myself most of the times." *Tr. Vol. 2* at 2; *Appellant's. App. Vol. 2* at 11, 67. On the day of the trial and before seating the jury, the trial court told Sanders on multiple occasions that he could have court-appointed counsel and a new date would be scheduled for the trial. *Tr. Vol. 2* at 5, 14-15, 21-25. Sanders instead chose to reject the trial court's multiple offers to appoint him counsel and to continue the trial. We acknowledge Sanders's lack of familiarity with the nuances of a criminal trial and the use of standby counsel to eliminate the disadvantages associated with pro se representation. However, under the circumstances of this case, including Sanders's rejection of court-appointed counsel, rejection of the trial court's consistent offers to appoint counsel, and his determination to represent himself at trial notwithstanding the trial court's warnings about the risks of proceeding pro se, we cannot say that the trial court abused its discretion by not discussing the possibility of standby counsel with Sanders.

## II. Sufficiency of the Evidence

[14] Next, Sanders challenges the sufficiency of the evidence supporting his conviction for intimidation as a Level 6 felony. When we review the sufficiency of the evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is not our role as an appellate court to assess witness credibility or to weigh the evidence. *Id.* We will affirm the conviction unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Id.*

[15] At the time Sanders committed the offense, Indiana Code section 35-45-2-1 ("intimidation statute") provided, in relevant part, that "[a] person who communicates a threat to another person, with the intent . . . that the other person be placed in fear of retaliation for a prior lawful act . . . commits intimidation[.]" The intimidation statute also provided an enhancement for the offense to a Level 6 felony if the "person to whom the threat is communicated . . . is a law enforcement officer[.]" Ind Code § 35-45-2-1(b)(1)((B)(i). The intimidation statute defines "communicates" to include "posting a message electronically, including on a social networking web site (as defined in IC 35-31.5-2-307)" and defines "threat" as "an expression, by words or action, of an intention to . . . unlawfully injure the person threatened or another person, or damage property . . . [or] commit a crime[.]" Ind. Code § 35-45-2-1(c)-(d). The term "law enforcement officer" is also a defined term, which means, "a police officer (including a correctional police officer), sheriff, constable, marshal,

prosecuting attorney, special prosecuting attorney, special deputy prosecuting attorney, the securities commissioner, or the inspector general[.]" Ind. Code § 35-31.5-2-185. Thus, to convict Sanders of the offense of intimidation as a Level 6 felony the state was required to prove that Sanders communicated a threat to Officer McCormick with the intent that Officer McCormick be placed in fear of retaliation for a prior lawful act.

[16] Sanders argues that his statement to Officer McCormick "on my soul vice lord I got you" is not a threat because the communication did not "expressly threaten any particular action likely to cause bodily injury or death" to Officer McCormick. *Appellant's Br.* at 10-11. He limits his argument to whether his statement was a threat. He does not challenge the other elements of the offense and does not dispute that he made the statement.

[17] Whether a particular communication constitutes a threat is an objective question for the trier of fact. *Owens v. State*, 659 N.E.2d 466, 474 (Ind. 1995). Thus, whether the communication Sanders made to Officer McCormick, objectively viewed, was a threat was a question of fact for the jury to decide.

[18] Here, the evidence showed that Officer McCormick warned Sanders on multiple occasions to leave the mall before Sanders eventually did so. *Tr. Vol. 2* at 78-81. When Sanders was outside the mall and was again approached by Officer McCormick to leave the mall's property Sanders started "flashing fingers" and giving "gang signs" and stated to Officer McCormick "on my soul vice lord I got you." *Id.* at 81, 84, 120. Officer McCormick testified that when

"somebody identifies . . . as a vice lord, which is one of the most [v]iolent gangs . . . [w]ith over 30,000 . . . members strong, documented I do not take those threats lightly at all." *Id.* at 81. Under the circumstances surrounding the interaction between Sanders and Officer McCormick, we conclude that the evidence presented by the State was sufficient for the jury to conclude beyond a reasonable doubt that Sanders's communication to Officer McCormick was a threat. *See Johnson v. State,* 743 N.E.2d 755, 757 (Ind. 2001) (affirming Johnson's intimidation conviction where Johnson displayed a firearm to an out-of-uniform officer and told the officer "'don't even think it', which was preceded by two obscene remarks, was sufficient for a trier of fact to conclude that Johnson communicated a threat within the meaning of the intimidation statute"); *Holloway v. State,* 51 N.E.3d 376, 378 (Ind. Ct. App. 2016) (affirming Holloway's intimidation conviction and noting that "Holloway cites no authority for the proposition that a person must be capable of inflicting injury when the statement is made . . . in order to constitute a threat."), *trans. denied.*

[19] We find the evidence is sufficient to support Sanders' conviction.

Affirmed.

Najam, J., and Brown, J., concur.